Commonwealth v. Coxe.

#### Negotiable instrument.

---

*170]                    *MARCH TERM, 1800.

---

### COMMONWEALTH v. TENCH COXE, Esq.

#### Settlement.—Holland Land Company.

The settlement and residence made necessary by sect. 9th of the act of 1792, within the times respectively mentioned therein, are not excused by the proviso in the same section; but if a warrant-holder has been prevented from making such settlement, or has been driven therefrom, by force of arms, and has persisted in his endeavors to make such settlement, no advantage can be taken of him, from want of a successive continuation of his settlement.[2] YEATES and SMITH, JJ., and SHIPPEN, C. J., dissenting.

If the condition of a grant by the commonwealth has not been fulfilled, advantage can only be taken of a breach of a condition, by the commonwealth, in a method prescribed by law.[3]

Quære? Whether a mandamus can be issued against the secretary of the land-office, commanding him to prepare and deliver patents in favor of a warrantee of a tract of land.[4]

IN September term last, a rule was obtained, on behalf of a number of persons, who had associated under the denomination of "The Holland Company," for the purchase and settlement of lands, lying in the county of Allegheny, north and west of the rivers Ohio and Allegheny, and west of

---

(a) s. c. 2 Yeates 487, where there is a full report of the case.

[1] But the collateral warranty only descends upon the eldest son, the heir at common law. Jourdan v. Jourdan, 9 S. & R. 268.

[2] Attorney-General v. The Grantees, post, p. 237; Patterson v. Ross, 22 Penn. St. 340.

[3] Morris v. Neighman, post, p. 209; s. c. 2 Yeates 450; Wilkins v. Allenton, 3 Id. 273; Eddy v. Faulkner, Id. 580.

[4] See Commonwealth v. Cochran, 5 Binn. 87.

Commonwealth v. Coxe.

Conewango creek, by which the secretary of the land-office was directed to show cause why a *mandamus* should not be awarded, commanding him to prepare and deliver patents to the company, for various tracts of land, for which warrants had previously issued in their favor, under the act of the general assembly, passed the 3d of April 1792. The attorney-general (*McKean*), *M. Levy, W. Tilghman* and *Cooper*, now showed cause for discharging the rule ; and *Lewis, E. Tilghman, Ingersoll* and *Dallas*, argued for making it absolute. In order, however, to introduce, with perspicuity and advantage, a discussion of the important question involved in this case, it is necessary to give a general view of the facts and circumstances, which produced the controversy.

By the charter granted to William Penn, on the 14th of March 1681, he became the proprietor of the soil embraced within the boundaries of Pennsylvania. The charter title, however, was fortified, as well since, as before the revolution, by successive purchases from the Indians ; whose claim may be considered as fairly and finally extinguished, throughout the territory of the state, by the treaty of Fort Stanwix, on the 23d of October 1784; and the treaty of Fort McIntosh, on the 21st of January 1785.(*a*) Independently *too, of the charter, the boundaries of the state have been defined [*171 and enlarged, by judicial decisions, by compact and by purchase. A controversy on the subject early arose between the proprietaries of Pennsylvania and Maryland ; which was finally adjusted in the year 1750, by a decree in the chancery of England, enforcing the specific performance of an agreement, which the parties had entered into in the year 1732.(*b*) The visionary and extravagant pretensions of Connecticut, extending to lands westward, as far as the South Sea, began to annoy the peace of Pennsylvania so early as the year 1753 ;(*c*) and although the rights of sovereignty and jurisdiction, after much irritation and conflict, were, at last, in the year 1782, authoritatively decided to belong to the latter state, the intruders under the spurious title of Connecticut continued to assert a private right of soil over a considerable tract of Pennsylvania.(*d*) The western line of the charter boundary, corresponding with the meanders of the river Delaware, remained undefined by actual survey ; and it was, for a while, difficult to ascertain the limits between the jurisdiction of Pennsylvania and Virginia ; but the two states, actuated by a just and friendly spirit of compromise, appointed commissioners to run a line of separation ; and their report upon the subject was adopted and established in the year 1784.(*e*) On similar principles, the jurisdiction and property of the islands in the river Delaware had been settled between Pennsylvania and New Jersey in the year 1783.(*g*) And in the year 1792, the state completed the present range

---

(*a*) For a reference to the purchases from the Indians, and to the laws respecting lands and the land-office, see 1 Dall. Laws, 5, 39, 248, 503, 891, 908; 2 Id. 21, 201; 3 Id. 209, and generally the proper titles to the index of that work.

(*b*) See Proud's History of Pennsylvania, 1 vol., 187; Penn *v.* Baltimore, Cases in Chancery, temp. Ld. Hardwicke, 332 ; s. c. 1 Ves. 444.

(*c*) For a history of the rise and progress of the claim, see a pamphlet published in the year 1774, by Dr. William Smith, the late provost of the college of Philadelphia.

(*d*) For the proceedings, which terminated in the decree of Trenton, see the Journals of Congress, for the year 1781, vol. 7, p. 169, 171, &c.

(*e*) See 2 Dall. Laws, 207.                                (*g*) See 2 Dall. Laws, 143.

of her territory, by obtaining a formal grant from the United States of a triangular tract of land, bounded by lake Erie ; which tract had been ceded and relinquished by resolutions of congress of the 6th of June, and 4th of September 1788 ; and the Indian title was purchased, and extinguished by commissioners, appointed by the state, in January 1789.

The settlement and cultivation of Pennsylvania have, at all times, been the favorite objects of her government. The proprietaries, while the soil and jurisdiction were vested in them, resisted every attempt of individuals to purchase lands from the Indians ; but permitted a free access to the land-office, or board of commissioners which they instituted, either for the purpose of obtaining original grants, or for the purpose of completing equitable *titles, within the territory over which they had themselves extin-
*172] guished the Indian claim. The ownership of the unappropriate soil naturally passed with the political sovereignty, from the proprietaries to the commonwealth, upon the principles of the revolution ; and accordingly, the legislature, on the 27th of November 1779, assumed the general territorial rights of the proprietaries ; but at the same time, confirmed to them all their private estates, and such proprietary tenths of manors, with the rents reserved on them, as had been surveyed and returned into the land-office, before the 4th of July 1776 : granting also a sum of 130,000l. sterling to the Penn family, as a mark of gratitude for the services of the founder of Pennsylvania.(a) This change in the ownership of the soil rendered it necessary to provide, under the authority of the state, for pre-existing claims to particular tracts of land, taken up and located under the proprietary grants, warrants and other office-rights. With that view, exclusively, a land-office was opened in the year 1781 ; (b) and in the ensuing year, a board of property was instituted, with power " to hear and determine in all cases of controversy or *caveats*, in all matters of difficulty or irregularity, touching escheats, warrants on escheats, warrants to agree, rights of pre-emption, promises, imperfect titles or otherwise, which heretofore have, or hereafter may arise, in transacting the business of the land-office."(c) The earliest direct appropriations of any of the territory of the state for public use, subsequent to the revolution, were two provisions ; the first for laying off a tract of land, to redeem the depreciation certificates which had been issued to the officers and soldiers of the Pennsylvania line ; and the second, for laying off another tract of land, to satisfy the donation which had been promised to the same troops, by a legislative vote of the 7th of March 1780 ; both tracts lying north and west of the rivers Ohio and Allegheny and Conewango creek.(d) On the 13th of April 1784, however, the land-office was opened, for granting and disposing of such of the unappropriated lands, as had been previously purchased from the Indians, at the rate of 10l. per hundred acres : (e) and soon afterwards, it was extended to the sale of lands within the purchase then made, or about to be made, at the rate of 30l. per hundred acres ; (g) the proceedings being regulated, so as to secure impartiality in the treatment of applicants, by an act of the 8th of April 1785.(h)

(a) See 1 Dall. Laws, 822.

(b) Ibid. 891.

(c) See 5th April 1782, 2 Dall. Laws, 21.

(d) See act 12 March 1783, 2 Dall. Laws, 88.

(e) 2 Dall. Laws, 201.

(g) See act 21st Dec. 1784, 2 Dall. Laws, 234.

(h) Ibid. p. 311.

Commonwealth v. Coxe.

From this operation of the land-office, thus opened, the reservations were confined—1st, to islands within the rivers Susquehanna and its branches, the Ohio, the Allegheny and the Delaware; *2d, to the appropriated [*173 lands north-westward of the Ohio and Allegheny; 3d, to the triangular tract on lake Erie, purchased from the United States; and 4th, to certain bounties or gifts conferred on religious or scholastic institutions, and pre-emptive rights granted or recognised by law. But a great portion of the valuable land of the state being sold, an act was passed on the 3d of April 1792, for the sale of all the remaining vacant lands within the commonwealth. By this act, the price of the vacant land within the purchase of the year 1768, and all prior purchases from the Indians, was reduced to 50 shillings for every hundred acres; the price of the vacant land within the limits of the purchase of the year 1784, and lying east of the river Allegheny and Conewango creek, was reduced to 5*l.* for every hundred acres; and all other lands belonging to the commonwealth, lying north and west of the rivers Ohio and Allegheny and Conewango creek (not specifically appropriated), were offered for sale, "to persons who will cultivate, improve and settle the same, or cause the same to be cultivated, improved and settled," for the price of 7*l.* 10*s.* for every hundred acres, with an allowance of six *per centum* for roads.

The manner of locating, surveying and securing to the respective purchasers the tracts of land claimed, either upon warrants upon actual settlements completed, or upon actual settlements commenced, may easily be traced in the several sections of the act; but as the present case depends particularly on a construction of the 9th section, it is proper to recite it here at large: "And be it further enacted, &c., that no warrant or survey, to be issued or made in pursuance of this act, for lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, shall vest any title in or to the lands therein mentioned, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall, within the space of two years next after the date of the same, make or cause to be made, an actual settlement thereon, by clearing, fencing and cultivating, at least two acres for every hundred acres contained in one survey, erecting thereon a messuage for the habitation of man, and residing, or causing a family to reside thereon, for the space of five years next following his first settlement of the same, if he, or she, shall so long live; and that in default of such actual settlement and residence, it shall and may be lawful to and for this commonwealth, to issue new warrants to other actual settlers, for the said lands, or any part thereof, reciting the original warrants, and that actual settlements and residence have not been made, in pursuance thereof, and so as often as default shall be made, for the time and in the manner aforesaid; which new grants shall be under and subject to all and every the regulations contained in this act: Provided always, nevertheless, that if any such actual settler, or any grantee in any *such original or [*174 succeeding warrant shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid, then, in either case, he and his heirs shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued. (3 Dall. Laws, 212.)

Commonwealth v. Coxe.

·As the dispensation contained in the proviso was to operate only in the case of an existing warfare, it was stated in the discussion of the present case, that, in fact, hostilities between the United States and the Indians, were never so entirely discontinued, from the period of the revolutionary contest, until General Wayne's treaty in the year 1795, as to render it practicable, with safety, to make actual settlements upon the lands in question. The position was shown, historically, from the military operations of the federal and state governments; judicially, from the opinions of the courts of justice; and experimentally, from the evidence of disinterested individuals. Thus,

After the European peace of 1783, an army was always maintained on the western frontier. During several years, General Harmer was employed in making hostile incursions into the Indian country; and in the year 1790, he was defeated. The progress of General St. Clair terminated also in defeat, on the 4th of November 1791, only five months previously to the date of the law. General Wayne succeeded to the command, prosecuted the war with vigor, and completely routed the enemy in the year 1794. This victory produced a treaty, which was signed on the 3d of August 1795, and was ratified on the 22d of December following. While these events occurred, the north-western frontier of Pennsylvania was constantly exposed to the sanguinary incursions of the Indians; many lives were lost; and in the very description of the proviso to the 9th section of the act, every actual settler or grantee was, "by force of arms of the enemies of the United States either prevented from making an actual settlement, or driven from it." The state of Pennsylvania, co-operating with the federal government, before the act passed, in the very session in which it passed, and so late as December 1795, called out parties of the militia, raised regular troops, and established military posts; and at one period, while negotiations for peace were carrying on, the state suspended her settlements, and plans of defence, in the country bordering on lake Erie, at the request of the federal government, lest the enemy might take umbrage and break off the treaty.(a)  In fine, *175] the result of these circumstances to prevent making and continuing actual settlements, during the Indian war, has been repeatedly recognised in the western county courts, and in the courts of *Nisi Prius*, held by the judges of the supreme court in Allegheny county, subsequent to the ratification of General Wayne's treaty.(b)

But the dispensation contained in the proviso, is likewise qualified with a stipulation, that the actual settler or grantee in any warrant, "shall per-

---

(a) For the various military measures pursued by the state government, and the general opinion of danger, see the following laws, and the entries in the journals of the senate: 3 Dall. Laws, 19, 17th March 1791; 1 Journ. Sen. 272–3, 24th August 1791; Ibid. 27, 29, 37, 47, 54, December 1791, and January 1792; 3 Dall. Laws, 177, 20th January 1792; 2 Journ. Sen., 8th December 1792; 3 Dall. Laws, 335, 3d April 1793; 2 Journ. Sen., 288, 29th August, 1793; Ib. 294, 4th September 1793; Ib. 5th December 1793; 3 Dall. Laws, 464, § 2, 3, 28th February, 1794; Ib. 483, 8th April 1794; 2 Journ. Sen., 264–5, 2d September 1794; 3 Dall. Laws, 757, 13th April 1795; Ib. 763, § 13, 14.

· (b) See Ewalt's Lessee v. Highland, *ante*, p. 161.   McLaughlin's Lessee v. Dawson, *post*, p. 221; and Morris's Lessee v. Neighman, *post*, p. 209.   Since this report was pre-

Commonwealth v. Coxe.

sist in his endeavors to make such actual settlement" as the law describes. The perseverance of the Holland Company, in time, in labor, and in money, was, therefore, exhibited in detail upon the present occasion. It appeared from various official documents and depositions, that the company had purchased and paid for 1162 tracts, of 400 acres each, situated in districts No. 1, 2, 3, 6 and 7, and that for these tracts, warrants of survey were issued, dated, respectively, in the months of April 1792, and of April and August 1793. From the day of issuing the warrants, until the present day, the endeavor of the company and their agents, to occupy, improve and settle the lands, has been incessant. Thus, as soon after the dates of the warrants, as the deputy-surveyors could be. prevailed upon to attempt to execute the surveys, in the years 1794 and 1795, a general agent was appointed to superintend the business of the company, a large store was built at Cassewago, or Meade-ville, and a sum exceeding $5000 was actually disbursed. In the year 1796, companies of settlers were invited, encouraged and engaged; ample supplies of provisions, implements, utensils, &c., were sent into the country; the expenses of transporting families were liberally advanced; a bounty of one hundred acres was given for improving and settling each tract; and a further sum of about $22,000 was actually disbursed.

In the year 1797, a sum of about $60,000 was further expended, in promoting the same objects, including payments *on contracts for settle- [*176 ment, and quieting adverse claims. In the year 1798, mills were erected, roads were opened, and other exertions were made, at a charge of not less than $30,000. In the year 1799, the sum of $40,000 and upwards was expended in improvements and settlements; in the salaries and wages of agents and workmen; in opening and repairing roads; and in patenting 876 tracts of land. And in 1800, the operations and advances of the company will, at least, be equal to those of any preceding year. In short, at the close of the present year, near $400,000 will be expended, according to the following view of the subject.

The amount of the purchase of the late James Wilson, Esq., including the purchase-money paid to the state, at the period of obtaining the warrants, was . . . . . . . . . . . . . . 222,071 10
The amount of disbursements for making improvements, settlements, &c., was . . . . . . . . . . . . . . . . . . 157,000 00
The amount of taxes and expenditures, for the year 1800, will be . . . . . . . . . . . . . . . . . . . . . 18,000 00
                                                                        ————————
                                                                        $397,071 10

pared, the same question has been agitated in the circuit court of the United States, in the Lessee of Balfour v. Meade (*post*, p. 363). The evidence was conclusive, that until the spring of 1796, it was not safe to prosecute settlements in the country lying north and west of the rivers Ohio and Allegheny, and Conewango creek: and although the cause was decided in favor of the defendant, who claimed as an actual settler, upon other grounds, Judge WASHINGTON, in his charge to the jury, admitted the fact to be proved, and declared, that where the fact. of prevention could avail the party, it operated during the whole war, and for a reasonable time (according to the circum-stances of the case) after the treaty of peace.

Commonwealth v. Coxe.

And regarding the operations of the company, in another aspect, we find, that the gross amount of the expenditures, upon the quantity of land which remained for them to improve and settle, will furnish an average at the rate of $230 for each and every tract. For instance :

|  | Tracts. |
|---|---|
| The original number of warrants called for, . . . . . . . | 1162 |
| But, from this aggregate, there must be deducted, on account of prior occupants of the land, . . . . . . . . . . . . . . | 113 |
| On account of tracts lost, upon resurveys, in district No. 1, | 11 |
| On account of tracts lost, upon resurveys, in district No. 6, | 3 |
| On account of bounties to actual settlers, who improved under the company, but at their own charge, one-fourth of 1021 tracts, . . . . . . . . . . . . . . . . . . . . . | 259 |
|  | ——  386 |
|  | 776 |

Then, it is seen, that the gross amount of the expenditure to the present period, of $178,000, being equally apportioned to 776 tracts, furnishes, as has been stated, an average disbursement of about $230, for improving each tract ; a sum which, in ordinary times, would certainly have been competent to accomplish every improvement designated in the act of the 3d of April 1792.

*177]  *But leaving these details, for a moment, to contemplate the general effect of the capital, industry and enterprise, which the Holland Company have thus employed and displayed ; and it is found, that by a conduct the most upright and conciliatory, they have avoided or adjusted every conflicting claim to any part of their purchase ; so that there does not now exist a single *caveat* on the files of the land-office, against the issuing of any patent they demand. The benefit of their exertions has extended, too, far beyond the limits of their own property : nor are they merely their neighbors who are accommodated and enriched ; but the opulence, population and security of the whole range of western frontier have been augmented beyond all calculation. Nay, the influence of the example has been diffused throughout the state, and is felt in every quarter of the Union.

Considering the terms of the act of the 3d of April 1792, it became a question at the land-office, in what manner the accomplishment of an actual settlement and residence, within the meaning of the enacting part of the 9th section, should be proved ; and also, upon what evidence the dispensation of the proviso was to be allowed. On the 1st object, the board of property, on the 16th of December 1797, prepared and published the form of a certificate, in the terms of the law, to be signed by the deputy-surveyor of the proper district, and by the district judge, or two justices of the peace, residing in the vicinity of the land : (a) and on the second object, they took the pre-

---

(a) The minute of the board of property, is in these words:

At a special meeting of the Board of Property, 16th Dec. 1797.

Present { DANIEL BRODHEAD, S. G. } of the
{ JOHN HALL, Secretary, } Land Office.
{ FRANCIS JOHNSTON, R. G. }

Resolved, That the following be the form of the certificate to be produced to the secretary of the land-office, before any patents shall issue for land lying north and west

Commonwealth v. Coxe.

caution of consulting the attorney-general, upon the form which they had drafted; and that gentleman, as it appears from the minutes of the board, dated the 21st December 1797, declared "the certificate proposed by them, respecting the lands lying north and west of the rivers *Ohio and     [*178 Allegheny and Conewango creek, to be unexceptionable, if there was added a clause, conformable to the proviso contained in the ninth section of the act, that where the settler or grantee has been prevented making such settlement, or hath been driven therefrom, by force of arms of the enemies of the United States, and has persisted in his endeavors to make such settlement, he is entitled, as if such settlement had actually been made and continued."(a)

*Upon such deliberation, and with such uniformity of opinion, in [*179

---

of the rivers Ohio and Allegheny, and Conewango creek, and that the same be signed by the proper deputy-surveyor of the district where the land lies, and by the district judge, or two justices of the peace in the vicinity of the said land, and that the secretary cause the said form, with this resolution, to be published in the Pittsburgh Gazette.

We do hereby certify, that ———— ———— hath made, or caused to be made, an actual settlement on a tract of land containing ———— acres, lying north and west of the rivers Ohio and Allegheny, and Conewango creek, situate, &c. (here describe the land), by clearing, fencing and cultivating at least two acres for every hundred acres, contained in the survey of said tract; that he hath erected thereon a messuage for the habitation of man, and resided, or caused a family to reside thereon, for the space of five years next following his first settling of the same.

(A true copy.)                                    JOHN HALL,
                                        Secretary of the land-office.

(a) The proceedings on this subject are as follows:

                                        December 21st, 1797.

The Board, desirous of establishing a legal form of a certificate, to be produced to the secretary of the land-office, before patents shall issue for lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, wrote to Jared Ingersoll, Esq., attorney-general, for his opinion and directions on this subject, to which they received the following reply, viz.:

" Gentlemen,

The certificate proposed by you, respecting the lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, appears to me to be unexceptionable in its form, provided you add a clause conformable to the proviso contained in the 9th section, that where the settler or grantee has been prevented making such settlement, or hath been driven therefrom by force of arms of the enemies of the United States, and has persisted in his endeavors to make such settlement, he is entitled as if such settlement had actually been made and continued."

Whereupon, the board made the following resolution, adopting the annexed form of certificates, viz.:

Resolved, That the following be the form of the certificate, or certificates, to be produced to the secretary of the land-office, before any patent or patents shall issue for lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, and that the same be signed by the proper deputy-surveyor of the district where the land lies, and by the district judge, or two justices of the peace, in the vicinity of the said land; and that the secretary cause the same form, with this resolution, to be published in the Pittsburgh Gazette:

"We do hereby certify, satisfactory proof having been made to us, that ———— hath made, or caused to be made, an actual settlement on a tract of land, containing ~ ———— acres, lying north and west of the rivers Ohio and Allegheny and Conewango creek,

*180] all the officers of the government, the forms of patents as well *as the forms of the certificates of settlement, or of prevention, were fixed and declared. The Population Company (an association formed on

---

situate, &c. (here describe the land), by clearing, fencing and cultivating at least two acres for every hundred acres contained in the survey of the said tract: that he hath erected, or caused to be erected, a messuage for the habitation of man, and resided, or caused a family to reside thereon, for the space of five years next following his first settling the same."

Or,

"We do hereby certify, that ——— the grantee or settler, hath been prevented from making a settlement on a tract of land, containing —— situate, &c. ——— conformable to the proviso contained in the 9th section of the act, entitled 'An act for the sale of vacant lands within this commonwealth,' passed the third day of April 1792, by force of arms of the enemies of the United States ; and that he, the said ———, hath persisted in his endeavors to make such settlement."

I certify, that the above and foregoing is a true copy of a minute of the board of property of Pennsylvania, entered in minute of property-book, No. 5, pages 259 and 260, remaining in the office of the secretary of the land-office of Pennsylvania. In testimony whereof, I have hereunto set my hand and seal, in the land-office aforesaid, at Lancaster, this 14th day of February, 1803.

ANDREW ELLICOTT,

(L. S.) Secretary of the land-office.

The form of Patent adopted, in case of Prevention, and issued to the Company.

THE COMMONWEALTH OF PENNSYLVANIA,

To all to whom these presents shall come, Greeting:

KNOW YE, That in consideration of the moneys paid by
(L. S.) THO. MIFFLIN. John Melbeck, into the receiver-general's office of this commonwealth, at the granting of the warrant hereinafter mentioned, and of the sum of three pounds, eight shillings and nine pence, lawful money, now paid by Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck, into the said office ; and also in consideration of the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck having made it appear to the board of property, that they were, by force of arms of the enemies of the United States, prevented from making such settlement on the hereinafter described tract of land, as is required by the 9th section of an act of the general assembly of this commonwealth, passed the third day of April 1792, entitled "an act for the sale of vacant lands within this commonwealth," within the time therein mentioned, and that they the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck have persisted in their endeavors to make such settlement, there is granted by the said Commonwealth unto the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck, of the city of Amsterdam, a certain tract of land called Normandy, situate in the district No. 2, north and west of the rivers Ohio and Allegheny, in Allegheny county, beginning at an ironwood ; thence, by land of Charles W. Peale, south, three hundred and twenty perches, to a red oak ; thence, by land of Michael Canner, west, two hundred and thirteen perches, to an oak ; thence, by land of William Camron and land of Peter Baynton, north, three hundred and twenty perches, to a white oak ; and thence by land of Isaac Paxton, east, two hundred and thirteen perches, to the beginning, containing four hundred and one acres, one hundred and fifty perches, and the allowance of six per cent. for roads, &c. (which said tract was surveyed in pursuance of a warrant, dated the eighteenth day of April 1792, granted

Commonwealth v. Coxe.

similar principles and with similar views) received, on the 4th of February 1799, patents for numerous tracts of land, upon exhibiting the proofs of prevention prescribed by the board of property. The Holland Company applied for patents for all their tracts, and have actually received patents for 876 racts ; the other patents being then withheld, merely for the purpose of a resurvey, which the surveyor-general directed to be made, in consequence of the inaccuracy of the deputy-surveyor. But before the resurvey could be executed, a change had taken place in the land-officers ; a new construction was given to the proviso attached to the 9th section of the act ; it was insisted, that no patent could issue, unless the terms of settlement and residence were, at some period, completed, though the obligation to complete them, during the Indian war, was suspended ; and the resolutions and proceedings of the former board of property, on the subject, were not deemed authoritative and conclusive upon the present board. At the same time, a number of persons intruded upon the lands of the warrantees, on the pretence that the forfeiture for non-settlement was absolute, at the expiration of two years from the date of the warrants, and set up claims as actual settlers. When, therefore, the Holland Company renewed their applications for the rest of their patents, the secretary of the land-office refused to issue them ; and the present motion, was made, to compel him to do so, as an official duty, by a writ of *mandamus.* (a)

Such were the circumstances (collected from evidence of unquestionable notoriety, from testimony in the cause, or from concessions of counsel) upon which the controversy arose. The general question was, whether the Holland Company had performed the condition of improvement, settlement and residence, annexed to the sale of the lands : or were released, by the operation of the proviso to the 9th section of the act, from the obligation to perform it ? And the arguments in support of the rule, embraced three distinct objects of inquiry : 1st. The facts relative to the hostile state of the country, and the persevering endeavors of the Holland Company to accomplish the

---

to the said John Melbeck, who by deed, dated the fifth day of January 1791, conveyed the said tract to the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck, with the appurtenances.  To have and to hold the said tract or parcel of land, with the appurtenances, unto the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck, their heirs and assigns, to the use of the said Wilhem Willink, Nicolaas Van Staphorst, Pieter Stadnitski, Christiaan Van Eeghen, Hendrick Vollenhoven and Rutgert Jan Schimmelpenninck, their heirs and assigns for ever, free and clear of all restrictions and reservations as to mines, royalties, quit-rents or otherwise, excepting and reserving only the fifth part of all gold and silver ore, for the use of this commonwealth, to be delivered at the pit's mouth, clear of all charges.  In WITNESS whereof, THOMAS MIFFLIN, governor of the said commonwealth, hath hereto set his hand, and caused the state seal to be hereunto affixed, the seventh day of October, in the year of our Lord, one thousand seven hundred and ninety-nine, and of the commonwealth, the twenty-fourth.                    .                    Attest,

JAMES TRIMBLE, Dep. Sec'ry.

(a) Several objections were made, in the course of the argument, to the form of the certificates produced by the Holland Company; but these and other objections in point of form, eventually yielded to a discussion and decision of the general question.

settlement prescribed by the act. 2d. The construction of the proviso attach·
ed to the 9th section of the act. 3d. The propriety of proceeding, in this case,
by *mandamus.*

I. Of the facts relative to the hostile state of the country ; and the per-
severing endeavors of the Holland Company, to accomplish the settlement
prescribed by the act.

*181]          *Whatever may be the effect of the proviso in suspending or
releasing the obligation to settle and improve the land, the case in
which it operates cannot be mistaken. If a grantee in any warrant is pre-
vented, by force of arms of the enemies of the United States, from making
an actual settlement, it is the express case of the proviso : but it will not be
contended, that the force of arms, here mentioned, means an actual applica-
tion of military force, the tomahawk, or the rifle, either to drive a man from
his settlement, or to prevent his entering upon the land, with a view to settle
it.   A well-grounded apprehension of personal violence and danger, from a
public enemy ; a terror arising from the force of arms in the neighborhood ;
are equally within the spirit and protection of the law.

The actual state of hostility is proved in every possible way.   The army
of the United States was opposed to the Indians, as to a public enemy, and
with various success, from the year 1783 to the year 1795.   At the time of
passing the act of the 3d of April 1792 (and, certainly, this fact furnished
the inducement for inserting the proviso to the 9th section), the whole of the
north-western frontier of Pennsylvania was in constant danger and alarm.
For some time after the act was passed, the deputy-surveyors did not dare
to venture upon the execution of the duties of their office.   And until the
spring of 1796, not an actual settler inhabited the country, except, perhaps,
a few bold and enterprising men, in the vicinity of a garrison.   But the con-
stitution of the United States has declared "that no state shall, without
the consent of congress, lay any duty of tonnage, keep troops or ships
of war, in time of peace, &c., or engage in war, unless actually invaded, or
in such imminent danger as will not admit of delay." Art. I. § 10.   Now,
the state of Pennsylvania did raise and maintain troops, for the defence of
her western frontier, from the 17th of March 1791, until the spring of the
year 1796, alleging "that there was imminent danger of being invaded by
the Indian tribes, then at war with the United States ; and that it was
necessary to take immediate and vigorous measures to prevent hostile in-
cursions, and to provide for the security of the frontier inhabitants of this
commonwealth."   The military operations of the state must, therefore, be
regarded, on constitutional ground, as the best evidence that a war existed ;
and the effects of that war, in preventing the settlement and occupancy of
lands lying north and west of the rivers Ohio and Allegheny and Conewango
creek, cannot be more forcibly portrayed, than in the legislative and execu·
tive declarations and acts of the government.   The judicial authority, in·
deed, has already settled the fact, that hostilities existed from the time of
passing the act, until the ratification of General Wayne's treaty ; and with-
out limiting the operation of the fact to a mere suspension of the condition
*182]   of settlement, improvement and residence, the operation, so far, *at
least, was expressly recognised, during the continuance of hostilities,
in the case of *Morris's Lessee v. Neighman (post, p. 209).*

Commonwealth v. Coxe.

But notwithstanding the hostile state of the country, the Holland Company commenced and prosecuted their attempts to settle and improve the land, during the whole period of the war, in a manner equally meritorious and beneficial. It is true, perhaps, that an attempt was not made to settle each particular tract ; but the general effort to settle the whole, was all that could be reasonably expected, under such circumstances ; a combination of force and capital could alone diminish the danger to be encountered ; and the result greatly contributed to establish a barrier against the incursions of the Irdians. To the exertions during the years 1794 and 1795, while the war continued, must be added the perseverance of the company, in their endeavors to settle and improve in every subsequent year. During the war, the disbursements for purchase money, and charges of improvement, amounted to near $230,000 ; and since the war, besides the allowance to settlers, the disbursements of cash have exceeded $178,000. Nor ought it to be forgotten, that after the dangers of war had ceased, another evil, almost as embarrassing, interrupted, annoyed and, in many instances, frustrated the endeavors of the company. Rumors, raised and circulated by artful and interested men, and countenanced by the obscure and equivocal language of the law, were heard to insinuate, that the warrantees had incurred a forfeiture of their lands, by the lapse of two years from the dates of the warrants, notwithstanding the terms of the proviso. Some of those persons who had engaged to settle for the company, began to assert a right of settlement for themselves. Hordes of intruders were pressing eagerly into the possession of the best tracts ; and in short, such was the doubt and solicitude universally excited upon this question of forfeiture, that the warrantees could hardly obtain assistance, in the business of settlement and improvement, upon the most liberal terms of participation in the land, or payment of expenses. Although these occurrences will sufficiently show the impracticability of settling each particular tract, even since the peace ; and although they increased the difficulties to be surmounted, in the general effort to settle the whole ; yet, the integrity, enterprise and perseverance of the company to effectuate the settlements, were uniformly displayed, and have, on every occasion, been candidly applauded. Upon motives of interest, as well as upon the principles of their contract, they "persisted in their endeavors :" for even after the board of property had decided, that they had acquired a legal title to the lands, and issued patents in their favor ; even at the moment of the present discussion ; they have been, and are, employed (anxiously, laboriously and expensively employed) in completing the settlement and improvement of every tract which they have purchased.

*Let it, then, be recollected, that this controversy does not arise [*183 between contending individuals, claiming under adverse titles ; but between individuals, who have long paid for the lands, and the commonwealth, who annexed to the sale certain conditions, to be released on a certain event, which event has actually happened. Of the forfeiture, if a forfeiture has accrued, the state alone can take advantage ; and independently of the strict legal question, will it be pretended, that on any principle of equity, the advantage of a forfeiture ought, in such a case, to be taken? The obstacle to a full compliance with the conditions of sale, proceeded from a public calamity, against which it was the duty of the government to protect its citizens, the existence and operation of which the individuals

Commonwealth v. Coxe.

could not avert or control ; and for the consequences of which, they ought not, upon the soundest maxims of civil policy, to be condemned to suffer: But if it was the object of the state to replenish her treasury by the sale of her western lands, that object has been promoted by the sale to the Holland Company, far beyond what could reasonably have been hoped. If the object was to strengthen and secure the frontiers, that object too has been more effectually obtained, by the general operations of the company, than it could have been by the weak and unconnected efforts of particular men : and if it is the spirit and policy of our laws, that the country should be settled, its soil cultivated, and the arts of social life extended, what country was ever more rapidly, or more, by the exertions of a single association, converted from a desert and a wilderness, into a scene of population, industry and prosperity ? Every inhabitant, every traveller, every writer, will be found in unison upon this subject ; and even the secretary of the land-office, whose conduct has occasioned the present motion for a *mandamus*, has appeared as the eulogist of the Holland Company ; exhibiting the merit and the success of their example, as an instrument to procure the public patronage for his own project of settlement, in other parts of the state.

Whatever, then, is the law, it must prevail : but it will not be denied, that a claim to a liberal and equitable construction of an ambiguous law, never was better founded. Prevented from accomplishing the settlements designated in the act, by a public enemy ; opposed in the prosecution of those settlements by intruders, who derived, indeed, some color for their pretensions, from an imperfect expression of the legislative meaning ; and thrown off their guard, by the deliberate decisions of the board of property, and the authoritative proceedings of the public officers, under the seal of the commonwealth ; can it be conscientious, can it be just, can it be honorable, that the Holland Company, after a labor of eight years, and an expenditure of $400,000, should be condemned to a forfeiture of the lands, for which they have paid the full consideration, in favor of the state, who has received that consideration ; who, if there has been error or mistake, the error or mistake *lies in the persons of her officers ; and who, if the doctrine of forfeiture prevails, will not only retain the consideration-money, but resume the soil, in absolute ownership, with all its ameliorations and improvements ? Strange as it would appear, to exact a forfeiture, under such circumstances, for the benefit of the state, the occurrence would be still more extraordinary, if it had only the effect to take the land from a meritorious warrantee, and to give it to a lawless intruder. Until the forfeiture is regularly established, until the government has determined to take advantage of it, and until a second warrant has issued, reciting the default of the first warrantee, any attempt of an individual to seize and retain the possession of the land, merits, not reward, but punishment. If such conduct should receive an executive, a judicial or a legislative, countenance, a scene of conflict, litigation and tumult must inevitably ensue, fatal to the rights of property, and the peace of the community. The spirit of interested jealousy will extend its baneful influence over what has been sanctioned with the seal of office ; intrusions and forcible entries will generate riots and civil feuds ; the company will be despoiled of every benefit from their patents, their labors and their disbursements ; and if right is not to be passively sur-

Commonwealth v. Coxe.

rendered to violence, the state will ultimately find another insurrection to suppress.

To avert the danger of such a scene, as well as to obtain a safe and certain guide for their conduct, the Holland Company have anxiously sought the opinion of this court; and they trust, that exceptions to form will not be permitted to defeat the present opportunity, to place the subject on a permanent foundation, just to the public, beneficial to settlers, and useful to warrantees. Unless, indeed, a judicial construction of the law can now be obtained, exertions and success will be in an inverse ratio : exertions will be greater, but settlements will be fewer, in each succeeding year; until despair takes the place of enterprise; and the whole business of settlement and improvement shall be abandoned to occupants, whose only title is force, without patent, without warrant and without purchase.

II. The construction of the proviso, attached to the 9th section of the act of the 3d of April 1792.

The exposition of the proviso, has produced a variety of propositions. 1st. By some, it has been supposed, that unless the terms of improvement, settlement and residence had been strictly performed, within the respective periods of two years and five years, a forfeiture accrued, though a war had raged throughout and beyond those periods. 2d. Others, admitting a qualified suspension of the condition, during a war, have, nevertheless, held, that no title could be acquired, until the performance of the terms of improvement, settlement and residence, though the war should last for a century; nor even then, unless the warrantee *had, during the whole war, persisted in his endeavors to perform them. 3d. A third construction maintains, that if a warrantee has been prevented, by force of arms, from accomplishing the improvement, settlement and residence, designated in the act, but has persisted in his endeavors to accomplish them, during the time mentioned in the 9th section, the proviso operates as an extinguishment of the condition, and the title becomes absolute. And 4th. It has been asserted, that a warrantee, having been prevented by war, from making the improvement, settlement and residence, during the time mentioned in the act, will acquire an absolute title, if he persists in his endeavors for a reasonable period, after the expiration of the war, though all his endeavors should prove ineffectual. [*185

1. The first opinion is at once extravagant and iniquitous. No rational man, during the existence of a war, which he could not resist or terminate, would have formed a contract of such a nature. Nor is it conceivable, if this were the design and meaning of the legislature, that the proviso would have found any place in the act, unless, indeed, fraud and deception can be imputed to its authors; and it is to be presumed, that an inconsistent, repugnant and ambiguous proviso has been employed, as the instrument to effectuate them? The enacting part of the 9th section prescribes a settlement to be finished in two years, and a residence to be continued for five years; and unless the proviso either dispensed with the settlement and residence altogether, or enlarged the periods for accomplishing them, it is utterly impossible to ascribe to it a motive or a use.

2. The second opinion is also pregnant with inconvenience, injustice and absurdity. If it affords the legitimate construction of the act, it applies equally to the case of the actual settler, before warrant, and to the case

Commonwealth v. Coxe.

of the warrantee, with a view to actual settlement. The price of the land could not, therefore, be collected for the use of the state, nor could a title be acquired by the individual, for a century, if the war should last so long ; nay, even at the termination of a long protracted war, the individual would be without remedy, unless he could prove, that whatever might be the intermediate expense or danger, his endeavors to accomplish a settlement had never been suspended or remitted. Consider the state of the country, and such a condition annexed to the purchase of lands, would inevitably frustrate the primary intention of the legislature.

2 & 3. But it is not directly denied, that the right of the Holland Company is alive ; and it is insinuated, that the opposite arguments do not militate against future grants, if the company shall go on to complete the settlements and residence described in the act. It is proper, therefore, to consider the second and third constructions of the 9th section, connected with each other, *and with the facts arising in the present case. The concession of the opposite counsel, is, indeed, an acknowledgment of the inception and progress, but a denial of the maturity, of the company's title : while it is contended, for the company, that although the enacting part of the 9th section constitutes a condition precedent to the vesting of a legal title in the warrantees, that condition is totally superseded or extinguished, if the case of the warrantee is embraced by the descriptions of the proviso ; so that he, thereupon, acquires a legal title, without settlement, improvement or residence.

By the act, two descriptions of settlers are contemplated : 1st. Those who have made improvements and settlements, without warrants ; and 2d. Those who apply for warrants, with a desire to settle and improve. On both descriptions, it is imposed as a condition precedent, that they shall pay the price of the land, when warrants are taken out; that they shall pay the expense of surveys ; and that they shall improve, settle and reside, in the manner, and for the period, prescribed. It is to be remarked, however, that a distinction is made, in one respect, between the settler and the warrantee ; the former being bound to fulfil the condition precedent personally ; and the latter being authorized either to do it himself, or to cause it to be done by others. This, which, at the first blush, might appear an advantage to the warrantee, is converted into a hardship and an injury, the moment the suspicion of forfeiture insinuates itself among the class of people who are to form the actual settlers. There is another distinction also, that the actual settler must pay interest from the date of the improvement ; and he was bound to apply for a warrant within ten years after passing the act ;(a) but, on the other hand, the land and personal property of the warrantee and actual settler were equally exempt from state taxes, for the same period ; and it is urged, that the price of the land was trifling, compared with its real value. Let it be answered, however, that the exemption from taxes can hardly be regarded as a favor ; and the lowness of the price affords no reasonable ground of argument. The settler without warrant is charged an interest, and the settler with warrant advances his money. From the fund created by warrantees, invested in the Bank of Pennsylvania and in public stock, the state has drawn a great

(a) The period has been enlarged. 4 Sm. Laws, 200.

Commonwealth v. Coxe.

portion of that revenue, which has been adequate, for many years, to all her objects of public expenditure and improvement. Besides, no state tax was then imposed, there was none likely to be imposed for ten years; and the fact is, that even at this day, a state tax is not in existence, nor in contemplation. The lowness of the price, too, arose from an avowed consciousness that a great part of the public lands would not sell higher; and as to the rest, the price would be exorbitant, *indeed, on the principles of the [*187 opposite construction. After all, the wealth of the state consists in its population, and advancement in the arts of agriculture, commerce and manufactures, not in the mere accumulation of coin.

These preliminary remarks are suggested, with a view to place the controversy on its real footing; on the footing of a bargain, in which the seller and the purchaser equally consulted their respective interests, and are equally bound (though the one is a state, and the other a private person), by the terms of the contract. It is agreed, that there was a condition precedent, which must be performed, or be dispensed with, upon the terms of the contract, before any title could vest in the warrantees. It is also agreed, that the condition precedent has not been strictly performed; for more than two years have elapsed since the date of the warrants, but no such settlement, improvement and residence have been made and continued, as the enacting part of the 9th section describes. What, then, is the operation of the contract, under such circumstances, connected with the Indian war? The adverse counsel will not explicitly aver, that the result is an absolute forfeiture of the lands; but they peremptorily deny that it amounts to a release or extinguishment of the condition precedent. Where, however, is the expression to be found, that the predicated event dispenses with the condition in part, and adheres to it in part; that dispenses with the limitation of time for performing the act, but, nevertheless, insists upon the act being performed? Even in the condition precedent, a residence of five years is not, in every case, necessary; for it is only required (independent of hostilities), if the warrantee or settler "shall so long live." That cause of absolute dispensation, with respect to residence, must often occur; and it is reasonable to conclude, that the existence of hostilities was likewise considered and intended as entitling the party to an equal degree of indulgence.

But after all, it must be agreed, that the wording of the act is, in some places, incoherent and absurd. Thus, on a grammatical construction, the actual settlement described by the 9th section, comprises a residence of five years; and yet, the same actual settlement is required to be made within two years from the date of the warrant. Subsequent passages, indeed, treat actual settlement and residence as distinct objects; but another confusion of ideas is introduced: for we find that the party is called " such actual settler," though he has been " prevented making such actual settlement," and it is provided, that "if he is prevented from making an actual settlement, but persists in his endeavors to make it, he and his heirs shall have and hold the lands, in the same manner, as if the actual settlement had been made and continued." From the difficulties of the language of the act, therefore, we must endeavor to rescue ourselves, by ascribing to the legislature a meaning, which, while it comports *with a rational exposition of the words, [*188 shall be consistent with public policy and the principles of justice.

The state, having received the money of the warrantees, was naturally

led, from the existing hostilities, to contemplate the **injury to which their** purchase was exposed. Whether the hostilities would prevent the settlement, or not, .t might be difficult to foresee ; but the legislature, in offering the lands for sale, must have held out the probability, that there would be a safe opportunity to settle ; or the condition of settlement could never rationally an l fairly have been proposed. If, therefore, the opportunity, implied in this overture, was defeated, it seems to follow, as a legitimate consequence, that the condition ought not to be enforced. Consider, for a moment, the situation of a warrantee, bound by the strict condition to settle, or, by the dispensing proviso, to persist in his endeavors to settle. He must explore, locate and survey each tract, before he can attempt to settle. He must collect, appropriate and apply the funds necessary to defray the various expenses of settlement, improvement and residence. He must be in constant preparation to seize and employ the opportunity for settling. Under such obligations, the mere pecuniary charge of watching for a safe occasion to enter upon his lands (independent of time, labor and anxiety) would, in most instances, be greater than the cost of actual settlement, in a season of public tranquility. Exhausted in money, perplexed by doubt and suspense, grown old and infirm in a course of exertion or persistence, what pretext could justify an accumulation of such disappointment, injury and loss, by exacting a forfeiture of the lands? The peace warrantee, who has waited until the storm has passed away ; or the intruder, who, at the close of a war, usurps the name of actual settler, has none of these calamities to encounter ; and yet, no greater price has been paid, no other conditions are imposed, in either of those cases, than in the case of the warrantee, who is defeated in all his exertions, and drained of all his resources, by the unavoidable operations of a public war !

Is there, then, no principle of justice and humanity, to claim relief from the legislature, upon the construction for which the Holland Company contend? Would it be unreasonable, to suppose, that under such circumstances, the legislature intended to vest in the persevering, but unsuccessful, warrantee, an absolute estate in the land, upon which he might establish a credit, to furnish means for renewing his exertions, and ultimately compensating his advances and his labors? If the supposition involves nothing unjust or irrational, the frame of words will sufficiently serve to give it body and effect. Thus, it is declared, that should the grantee " be prevented from making such actual settlement," and persist in his endeavors to make it, he shall hold the lands, as if it were made and continued : but the word prevented implies *that he had failed ; and persisting in an endeavor, does not import succeeding in it. Again, the grantee is to have the lands, if he persists in his endeavors to make such actual settlement: but this does not involve a condition, that he shall persist until he has made it, or so as to make it ; and " endeavoring to make," is an expression that designates an attempt, not a performance. Again, if the grantee is prevented, but persists in his endeavors to settle, he is entitled " to have and to hold the lands, in the same manner as if the actual settlement had been made and continued :" but no title could vest in the grantee, unless the condition precedent was performed ; and yet, by force of the proviso, he is to have the lands (not merely the benefit of a prolongation of the time for settlement), in a case where, from the hypothetical terms employed, it must be clearly understood that

Commonwealth v. Coxe.

the condition had not been performed. Again, the grantee, being **prevented,** but persisting in his endeavors to settle, is, by force of the proviso, to have and to hold the lands, " in the same manner," as if the condition precedent had been performed : but if the condition precedent had been performed, the grantee would have held the lands in fee, discharged from any limitation, contingency or incumbrance whatsoever ; and consequently, in this case, to enable the grantee to hold in the same manner, persisting in his endeavors to settle, must be considered as tantamount to actual settlement and residence. In short, in every sentence of the proviso, the legislature plainly points at a certain state of things, at some concurrence of circumstances, when the grantee would be absolutely entitled to the land, before, and without, making and continuing an actual settlement.

The only question, then, must be, what is the nature of the endeavors prescribed ; during what period, the endeavors are to be made ; and how long the grantee is bound to persist ? The actual settlement must be made or excused, within two years from the date of the warrant ; and the residence must not only be five years, but five years next following the first settlement. The time, therefore, is a characteristic of the condition precedent ; an ingredient in the definition, as essential to the contract, as the nature of the act required to be performed. If the time is as essential, it is as limited, as the nature of the act to be performed ; and hence, does it not follow, that at the expiration of two years, as to the settlement, and of five years, as to the residence, the condition must be actually performed or virtually annulled ? The excuse for non-performance is also limited ; since, on an allegation of being prevented from settling or residing, the grantee must state the force of arms which prevented him, to be within, and until the end of two years (as to the settlement) next immediately after the date of his warrant ; and within and until the end of five years (as to the residence) from the date of his first settlement ; or his plea shows no dispensation from the condition. *Thus, the time, within which performance is to be effected, or an [*190 apology for non-performance to be received, is the same, or, at least, commensurate : and if the period within which the substitute for performance is exacted, within which the endeavor to perform must be shown, cannot be extended in favor of the warrantee, what right, express or implied, can there be, on the part of the state, to insist on a continuance of the endeavor, beyond the period within which the contract obliged her to accept it, as a commutation for the performance ? Equality is equity, whoever may be the parties to the bargain—states or individuals : but it would be a doctrine of arbitrary prerogative, if performance, or endeavors to perform, should only avail the grantee, to release him from the condition, within a limited period ; yet, that the obligation to perform, or to persist in the endeavor to perform, should be indefinite and perpetual. Nor is the idea correct, that the war excused the warrantees from endeavoring to effect a settlement, during its continuance ; and that the law contemplated a perseverance only when it could be effectual. On the contrary, the law obviously required a perseverance in the endeavor to settle during the war ; but left the degree of perseverance to be regulated by considerations of a reasonable discretion and personal safety. That this was the construction of the Holland Company, appears incontestably, from the immediate steps which they pursued to complete their surveys and improvements : and this is, in truth,

the material ground of complaint against the opposite doctrine ; that, by the contract, the grantees were obliged to make laborious, hazardous and expensive exertions, during the war ; and, yet, at the conclusion of the war, derive no advantage from those exertions, in consummating the legal title to the lands.

On the doctrine, that the grantee or settler must persist in his endeavors to improve and reside, for any other periods, or beyond the respective · periods of two and five years, let it be asked, when those other periods are to commence, and how long are they to be protracted ? The law itself is silent ; and yet, if an intention of that kind had been entertained, how easily, and how certainly, would the legislature have said, that " the grantee shall have the lands, if the settlement is completed within two years after the cessation of hostilities, and the residence continued for five years subsequent to the same epoch." But by whom shall the silence of the law be supplied ? What power exists to add the slightest circumstance to the terms of the contract ? The legislature, as a party, cannot explain or expound it. The courts of justice can only declare the meaning, from the fair and genuine import of the language of the act ; they cannot diminish or enlarge the vested rights of individuals, any more than they can supersede the rights of the state. And on this occasion, the officers of the land-office have only a ministerial function to perform. Let it, therefore, be *191] repeated, that *the proviso to the 9th section having rested the consummation of the grantee's title, simply upon the persisting in an endeavor, it would be creating a new contract, making a new law, introducing another principle, and amplifying the words of the legislature, to require, not a persevering endeavor, but an actual performance. Besides, would it be just, to fix upon the close of the war, as the period for commencing the endeavor, without giving some credit for the exertions of the grantee or the settler, *flagrante bello ?* And yet, who shall make the apportionment of time, of labor and of expense ; and upon what principle, can it be made ? It often happens, that what is intended to afford an undue preference to a favorite, in a remote consequence, proves peculiarly injurious to him. The merits of the actual settler have sometimes been enhanced, in order, by an invidious comparison, to depreciate the claims of the purchaser or warrantee : but, it is obvious, that a determination upon the ground taken by the opposite counsel, would operate more severely, with greater cruelty, towards the actual settler, than any consequence that can flow from the construction urged in favor of the Holland Company. For instance, a man enters upon his lands, in the year 1792, with a view to make the improvements which the act requires. He is attacked by the Indians, and driven from his cabin and his field, before he has time to make any visible progress in building, clearing and cultivating ; but he observes, in the words of the act, that being driven from his settlement, he shall, nevertheless, have title, as if he had completed his improvement and continued his residence, if he persists in his endeavors : he, therefore, returns the next year, and is again driven away, *re infecta ;* and so on, for a succession of years. Shall such a perseverance be accounted as nothing ? And is it not obvious, that to require that the actual settler shall be driven away, and constantly kept away, and yet shall complete the settlement and residence, places him in a condition

more grievous than even the case of the warrantee, who is merely prevented from entering and improving the land?

Upon the whole, then, let the proviso operate as a release of the condition precedent, or let it be taken as qualifying the condition, and requiring a reasonable perseverance during or after a war, the claim of the Holland Company must be established. They persisted, in spite of every danger, while hostilities raged; and more than five years have elapsed since the Indian treaty, during which they have also persisted.

III. Of the propriety of proceeding, in this case, by a *mandamus.* In entering upon this part of the discussion, it is proper to inquire, whether the construction given by the board of property to the proviso is not conclusive. It was given after great deliberation, *and upon the legal [*192 advice of the law-officer of the state. Patents have been issued, in · pursuance of the construction; and transfers have been made and accepted, upon the faith of the public grants, under the great seal. *Stare decisis* is a maxim to be held for ever sacred, on questions of property; and in the present instance, applies with peculiar force, as the rule was given by the state herself, through the medium of her officers; and with her alone, not with any individual, can a conflict arise. The board of property is of a judicial character, and had jurisdiction in the present case. (2 Dall. Laws, 21, § 2, 3; 3 Ibid. 2, 456; 4 Ibid. 476; 3 Ibid. 213, 311.) There is no revisory or appellate authority established for questions of this nature: and, certainly, the secretary of the land-office, though a constituent member of the board of property, is merely, as secretary, a ministerial officer, bound by the decisions of the board, though contrary to his own opinions. His ministerial duties (of which it is one, that he shall obey the orders of the board of property) are stated in the several laws relating to the land-office, and they have received a practical exposition, which devolves on him the care of preparing patents for the governor's signature, and the seal of the state. He is bound, then, to execute the public laws relating to the land-office; and, if he refuses to do so, the court will compel him by *mandamus,* on general principles, as well as on the authority of particular cases.

The general principle of the *mandamus* points at cases, in which there is no other legal, specific remedy; for a satisfaction in damages is not regarded, in such cases, as an adequate reparation: and then it may be awarded to any public, or private person. (1 Woodes. Lect. 118; 3 Black. Com. 110; 3 Burr. 1267, 1659; 4 Ibid. 2188; 2 Ibid. 1045; 3 T. R. 651; Ibid. 404; Doug. 568.) The particular instances are numerous. It lies to compel the ordinary to grant letters of administration. (1 W. Black. 640.) To compel the delivery of an administration-bond to be put in suit. (4 Bac. Abr. 508; Cowp. 140.) To compel the grant of a license to a curate, if refused without just reason. (4 Bac. Abr. 502, 506; 2 Str. 797.) To compel the proper officer to affix a seal. (4 Bac. Abr. 509.) Or to register a certificate, being merely a ministerial act. (Ibid. 508; 1 Wils. 283.) To compel the party to proceed in proving a will. (Ld. Raym. 235; 15 Vin. Abr. 203.) To oblige any officer to do his duty. (4 Com. Dig. 207.) To compel obedience to things enjoined by statute. (2 Str. 992.) To compel the enrolment of a testament, which, by custom, ought to be enrolled. (2 Roll. Abr. 106; 1 Sid. 443.) To compel a clerk of a company to deliver up books.

Commonwealth v. Coxe.

(1 Str. 879.) To compel an old officer to deliver records to a new one. (1 Sid. 31.)

The arguments in opposition to the motion for a *mandamus*, were arranged under three considerations: 1st. What is the real *import of the *193] condition precedent: 2d. What the Holland Company had performed, to vest in them a legal title to the lands: and 3d. Whether a *mandamus* does lie to the secretary of the land-office, even if the company are entitled to patents.

I. What is the real import of the condition precedent.

This general inquiry naturally divides itself into a view of what must be accomplished by persons who meet with no prevention from the enemies of the United States; and of what must be done, even by persons who are so prevented, in order to obtain a legal title to the land. The policy and object of the legislature are to be ascertained, by the circumstances which induced them to pass the act of the 3d of April 1792. Before it was passed, and at the time of passing it, there was a subsisting Indian war; and the treaty of 1794 between the United States and Great Britain, had not removed the causes of irritation and apprehension in relation to that power, which extended along the northern and western boundaries of the state. Hence, it became of the greatest importance to advance the range of settlement; and to interpose the barrier of a bold and hardy population, in the quarter where danger was so apparent. Treasure was, obviously, only a secondary consideration; and settlement itself was only stipulated, where the danger existed. Thus, the lands east of the Allegheny were offered for sale, unshackled with conditions of settlement; while those on the west could never be vested in any individual, upon any other terms, than those of actual settlement and residence. The steady caution of the legislature on this point, is conspicuous in almost every section of the act. The sale is only offered to persons, who will cultivate, improve and settle the lands. (3 Dall. Laws, 209, § 2.) An actual settler, without warrant, is so highly regarded, that although the law would deem him a trespasser, on general principles, the act prohibits any deputy-surveyor from surveying any settled land, but for the owner of the settlement. (§ 5, p. 210.) A period of ten years' credit is given to an actual settler for the price of his land. (§ 10, p. 210.) The land is exempt from direct taxes for an equal term. (§ 12, p. 213.) And when the legislature, in the year 1794, closed the land-office, it was with an express exception in favor of actual settlers. (3 Dall. Laws, 637.) (a) In addition to these proofs of the policy and design of the legislature, it must be of great force, to recollect, that shortly before the time of offering the land for sale at the rate of 7*l*. 10*s*. per 100 acres, the state had paid to *194] the United States, at the rate of three-fourths of a *dollar for every acre, contained in the triangular tract bordering on lake Erie. (b)

(a) The land-office appears to have been closed, upon the suggestion of the governor, that warrants had issued for a greater quantity of land than the state owned; and not with a view to favor actual settlers. See the governor's message of the 2d of September 1794.

(b) The payment was made in public **certificates; which, it was insisted, were** greatly depreciated in value.

Commonwealth v. Coxe.

The language of the act ought, then, to be expounded, in consistency with the policy that gave it birth; and this can only be done, by considering the effect of a prevention by a public enemy, to be a suspension, and not an extinguishment, of the obligation to settle and reside upon the land. The legislature must have presumed that, notwithstanding the existence of the Indian war, there would be an extension of the western settlements; the accomplishment of a settlement was made a *sine qua non* to the investment of a legal title ; and the proviso declares nothing more, in effect, than that the war shall be an excuse for non-settlement, while it continues, and the warrantee sincerely persist in his endeavors to settle. But an endeavor to settle must be shown, whether war raged or not; and the endeavor must be to settle every tract (each being the subject of a separate grant), not a general effort to improve an extensive and indefinite range of country. It being the spirit of the contract, that the land should be settled, no argument ought to avail, on the score of the warrantee's having paid the stipulated price ; and the word settlement, wherever used, is pregnant with all the consequences of building, cultivation and residence, described in the 9th section of the act It is now too late to complain of hard terms. Whatever was intended and undertaken, by virtue of the law, it is just and lawful to enforce. Say, even, that a forfeiture has been incurred, and insisted on, it can be no reason, at this day, to reproach the government. That point, however, is not urged; for every argument, used on the present occasion, to oppose the *mandamus*, is perfectly consistent with the idea of future grants or patents being issued to the Holland Company, if they persevere, and in a reasonable time, comply with the requisites of the condition precedent.

II. What have the Holland Company performed, to vest in them a legal title to the lands ?

It must be repeated, that every tract is the subject of a distinct grant ; and that the condition precedent attaches to each tract. Nor does it affect the obligations of the condition, that the Holland Company are the holders of all the warrants in question ; for the law is the same, as if each warrant belonged to a separate individual owner. Have the company, then, shown an actual settlement, or even an endeavor to settle, upon each of the tracts ? The evidence exhibited by the company themselves establishes a contrary position. Can it be sufficient to say, that they have improved a great deal of the country, and therefore, are entitled to hold what they have not improved ? The spirit of monopoly *was an evil against which the legis-   [*195 lature meant to guard, by dividing the territory offered for sale into tracts, and restricting the right of purchase to a single tract. It is true, that the contrivance of opulent speculators has evaded the legislative precaution; and instead of each settler being the owner of the tract on which he resides, he is the mere instrument of an association of foreigners (who never have visited, and probably, never will visit America), to obtain, for their emolument, the lands which the state had offered for sale, with very different views of policy and benefit.

Let it be admitted, however, that the Indian war operated as an excuse for not settling each tract until the spring of 1796 ; yet, the ratification of General Wayne's treaty removed every obstacle, and was a warning to every warrantee, that the season had arrived, when, by persisting in his endeavors, he might consummate his legal title. If, indeed, no industry or care could

have enabled the company to comply with their contract, the condition would still, perhaps, be suspended: but it is not clear, that a settlement was impracticable at any time, and certainly, it has been practicable for five years past. The company have already obtained 876 patents, without a performance of the condition ; and it is remarkable, that until the resurvey in 1799, they could not even ascertain what tracts were embraced by the remaining 153 warrants. As to the lands, therefore, for which patents are now claimed, nothing more has been done by the company, than to locate and survey them ; and unless the Indian war operated as a release of the condition, there is no title acquired ?

III. Whether a *mandamus* does lie to the secretary of the land-office, even if the Holland company are entitled to patents.

The Board of Property is a court of justice; and should be governed by the principles of law, in relation to the proof of matters within their jurisdiction. The certificate of prevention, framed by the order of the 21st of December 1797, is destitute of every characteristic of evidence ; and it has even been evaded, in the manner of returning it; for the order required the signature of the proper deputy-surveyor, and two justices ; but in many instances, the certificate is signed by the same person twice, once as deputy-surveyor, and again as a justice. Consider the order as a rule of practice; rules of practice are for ever in the power of the court, to alter or rescind ; and the succeeding board of property could not be restrained in this respect, by the acts of their predecessors. Besides, the order of the 21st December 1797, is radically defective in other points. The board of property was bound to inquire for themselves, whether settlements had been completed or prevented, within the meaning of the law ; it was a judicial authority, which could not be delegated ; and yet, by this order, it was actually transferred to the deputy-surveyors *and justices ; nor was the sanction of an oath required for the fidelity of their certificate ; which, indeed, is not a statement of facts, but the declaration of a result. The introduction of such an order was, therefore, an error, and its revocation became a duty.

The secretary of the land-office, in his judicial capacity, as a member of the board of property, decided against the force of the certificate of prevention, to entitle warrantees to patents ; and the effect of the *mandamus* would be, to compel him to do, as an executive officer, what he has declared, as a judge, ought not to be done. Nor is the act required within the duties of his office. The patent is an act of the governor ; and affixing the state seal, is an act of the secretary of the commonwealth : but the secretary of the land-office can neither issue a patent, nor affix the seal, nor compel others to do so. It is to be remembered, likewise, that the board of property is established expressly as a tribunal to advise and regulate the proceedings of the land-office ; and a *mandamus* ought not to issue to any of the ministerial officers, requiring an act to be done, which the board has prohibited. (2 Dall. Laws, 21 ; 3 Ibid. 3, § 3 ; 3 Bl. Com. 111.)

But there is, both in law, and in practice, a specific, appropriate and adequate remedy, which supersedes any pretext for issuing a *mandamus*. If the secretary of the land-office refuses to perform a duty, an application may be made to the board of property, whose orders he must obey ; and if the decision of the board of property is not satisfactory to the applicant, he may institute an ejectment By this course, order will be preserved,

Commonwealth v. Coxe.

justice will be administered, and the interests of the state, as well as of individuals, will be protected.

After taking time for deliberation, the judges delivered their opinions *seriatim:*(a)

SHIPPEN, Chief Justice.—The legislature, by the act of the 3d of April. 1792, meant to sell the remaining lands of the state, particularly, those lying on the north and west of the rivers Ohio and Allegheny. The consideration-money was to be paid, on issuing the warrants. They had likewise another object, namely, that, if possible, the lands should be settled by improvers. The latter terms, however, were not to be exacted from the grantees, at all events. The act passed at a time when hostilities existed on the part of the Indian tribes. It was uncertain, when they would cease : the legislature, therefore, contemplated, that warrants might be taken out, during the existence of these hostilities, which might continue so long, as to make it impossible for the *warrantees to make the settlements required, for a length of time ; not, perhaps, until after these hostilities should entirely cease. Yet, they make no provision, that the settlements should be made within a reasonable time after the peace ; but expressly within two years after the dates of the warrants. As, however, they wished to sell the lands, and were to receive the consideration-money immediately, it would have been unreasonable, and probably, have defeated their views in selling, to require settlements to be made on each tract ·of four hundred acres, houses to be built, and lands to be cleared ; in case such acts should be rendered impossible by the continuance of the Indian war. They, therefore, make the proviso, which is the subject of the present dispute, in the following words :· " Provided always, nevertheless, that if any such actual settler, or any grantee in any such original or succeeding warrant, shall, by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid ; then, in either case, he and his heirs, shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued."

When were such actual settlements to be made ? The same section of the act, which contains the above proviso, gives a direct and unequivocal answer to this question, " within the space of two years next after the date of the warrant." If the settlements were not made within that time, owing to the force, or reasonable dread, of the enemies of the United States, and it was evident, that the parties had used their best endeavors to effect the settlement ; then by the express words of the law, the residence of the improvers for five years afterwards, was expressly dispensed with ; and their titles to the lands was complete, and patents might issue accordingly. It is contended, that the words " persist in their endeavors " in the proviso, should be extended to mean, that if, within the two years, they should be prevented by the Indian hostilities from making the settlement ; yet, when

[*197

---

(a) Mr. Justice BRACKENRIDGE having been retained, while he was at the bar, as counsel for the Holland Company, declined taking any part in the decision of this cause.

Commonwealth v. Coxe.

they should be no longer prevented by those hostilities, as by a treaty of peace, it was incumbent on them, then, to persist to make such settlement. The legislature might, if they had so pleased, have exacted those terms (and they would not, perhaps, have been unreasonable) ; but they have not done so : they have expressly confined the time of making such settlements, to the term of two years from the date of the warrant. Their meaning and intention can alone be sought for, from the words they have used, in which there seems to me, in this part of the act, to be no great ambiguity. If the contrary had been their meaning, they would not have made use of the word "endeavors," which supposes a possibility, at least, if not a probability, as things then stood, of those endeavors failing, on account of the hostilities ; *198] and would, therefore, *have expressly exacted actual settlements to be made, when the purchaser should no longer run any risk in making them.

The state having received the consideration-money, and required a settlement within two years, if not prevented by enemies ; and in that case, dispensing with the condition of settlement and residence, and declaring that the title shall be then good, and as effectual as if the settlement had been made and continued ; I cannot conceive, they could mean to exact that settlement, at any future indefinite time. And, although it is said, they meant that condition to be indispensable, and that it must be complied with in a reasonable time ; we have not left to us that latitude of construction, as the legislature have expressly limited the time themselves.

It is urged, that the main view of the legislature was to get the country settled and a barrier formed : this was, undoubtedly, one of their views, and for that purpose, they have given extraordinary encouragement to individual settlers ; but they had, likewise, evidently, another view, that of increasing the revenue of the state, by the sale of the lands. The very title of the act is "for the sale of the vacant lands within this commonwealth ;" this latter object they have really effected, but not by the means of the voluntary settlers ; it could alone be effected by the purses of rich men or large companies of men, who would not have been prevailed upon to lay out such sums of money as they have done, if they had thought their purchases were clogged with such impracticable conditions.

I have hitherto argued, upon the presumption, that the words "persist in their endeavors," relate to the grantees as well as the settlers ; but in considering the words of the proviso, it may be well doubted, whether they relate to any other grantee or settler, than those who have been driven from their settlements. The word "persist," applies very properly to such. The words of the proviso are, "if such actual settler, or any grantee, shall by force of arms of the enemies of the United States, be prevented from making such settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement ; then, in either case, he and his heirs shall be entitled, &c." Here, besides that the grammatical construction of referring the word "persist" to the last antecedent, is best answered; the sense of it is only applicable to settlements begun, and not to the condition of the grantees. There are two members of the sentence, one relates to the grantees, who, it is supposed, may be prevented from making their settlements : the other to the settlers, who are supposed to be driven away from the settlements. The latter words, as to them, are proper ; as to the

Commonwealth v.. Coxe.

grantees, who never began a settlement, improper. The act says, in either case, that is, if the grantees are prevented from making their settlements, or *if the settlers are driven away, and persist in their endeavors to complete their settlements, in either case, they shall be entitled to the land. [*199

I will not say, this construction is entirely free from doubt : if it was, there would be an end of the question. But taking it for granted, as it has been done at the bar, that the words relate to the grantees, as well as to the settlers ; yet, although inaccurate with regard to the former, it seems to me, the legislature could only mean to exact from the grantees, their best endeavors to make the settlements, within the space of two years from the date of their warrants ; at the end of which time, if they have been prevented from complying with the terms of the law, by the actual force of the enemy, as they had actually paid for the land, they are then entitled to their patents. If the legislature really meant differently, all I can say is, that they have very unfortunately expressed their meaning.

The propriety of awarding a *mandamus,* is another question, which I mean not to discuss, as I presume a decision of a majority of the court will make it unnecessary.

YEATES, Justice.—I have long hoped and flattered myself, that the difficulties attendant on the present motion, would have been brought before the justice and equity of the legislature for solution, and not come before the judicial authority, who are compelled to deliver the law as they find it written for decision. The question has often occurred to our minds, under the act of the 3d of April 1792, which has so frequently engaged our attention in our western circuits.

The Holland Company have paid to the state the consideration-money of one thousand one hundred and sixty-two warrants, and the surveying fees on one thousand and forty-eight tracts of land ; besides making very considerable expenditures, by their exertions, honorable to themselves, and useful to the community (as has been correctly stated), in order to effect settlements. Computing the sums advanced, the lost tracts, by prior improvements and interferences, and the quantity of one hundred acres granted to each individual for making an actual settlement on their lands ; it is said, that, averaging the whole, between $230 and $240 have been expended by the company, on each tract of land they now lay claim to.

The Indian war, which raged previous to, and at the time of the passing of the law, and until the ratification of the treaty at Fort Grenville, must have thrown insurmountable bars in the way of those persons, who were desirous of sitting down immediately on lands, at any distance from the military posts. These obstacles must necessarily have continued for some time after the removal of impending danger, from imperious circumstances ; the *scattered state of the inhabitants, and the difficulty of early [*200 collecting supplies of provisions ; besides, it is obvious, that settlements, in most instances, could not be made, until the lands were designated and appropriated by surveys, and more especially so, where warrants have express relation to others, depending on a leading warrant, which particularly locates some known spot of ground.

On the head of merit, in the Holland Land Company's sparing no expense to procure settlements, I believe, there are few dissenting voices

Commonwealth v. Coxe.

beyond the mountains: and one would be induced to conclude, that a variety of united, equitable circumstances would not fail to produce a proper degree of influence on the public will of the community.   But we are compelled by the duties of our office, to give a judicial opinion upon the abstract legal question, whether, if a warrant-holder, under the act of the 3d of April 1792, has begun to make his actual settlement, and is prevented from completing the same, "by force of arms of the enemies of the United States, or is driven therefrom," and shall make new endeavors to complete the same, but fails in the accomplishment thereof, the condition of actual settlement and residence is dispensed with and extinguished?

I am constrained, after giving the subject every consideration in my power, to declare, that I hold the negative of the proposition, for the following reasons, collected from the body of the act itself:

1st. The motives inducing the legislature to enact the law, are distinctly marked in the preamble, that " the prices fixed by law for other lands" (than those included in the Indian purchase of 1768), "are found to be so high, as to discourage actual settlers from purchasing and improving the same." (3 Dall. Laws, 209.)

2d. " The lands lying north and west of the rivers Ohio and Allegheny and Conewango creek, are offered for sale, to persons who will cultivate, improve and settle the same, or cause the same to be cultivated, improved and settled, at and for the price of 7l. 10s. for every hundred acres thereof." By § 2, the price of lands is thus lowered, to encourage actual settlements.

3d. By § 3, "upon the application of any person who may have settled and improved, or is desirous to settle and improve, a plantation within the limits aforesaid, there shall be granted to him a warrant not exceding four hundred acres," &c.

The application granted, is not to take up lands; but it must be accompanied, either by a previous settlement and improvement, or expressions of a desire to settle and improve a plantation; and in this form, all such warrants have issued.

*4th. By § 5, "lands actually settled and improved, prior to the date of the entry of a warrant with the deputy-surveyor of the district, shall not be surveyed; except for the owner of such settlement and improvement." This marked preference of actual settlers over warrant-holders, who may have paid their money into the treasury for a particular tract, even, perhaps, before any improvement of the land was meditated, shows, in a striking manner, the intention of the legislature.

5th. By § 8, "the deputy-survivor of the district, shall, upon the application of any person who has made an actual settlement and improvement on these lands, survey and mark out the lines of the tract of land, not exceeding four hundred, for such applicant." The settlement and improvement alone are made equivalent to a warrant; which may be taken out, by § 10, ten years after the time of passing this act.

6th. I found my opinion, on what I take to be the true and legitimate construction of the 9th section; in the close of which, is to be found the proviso from whence spring all the doubts on the subject. It has been said at the bar, that three different constructions have been put on this section.

(1.) That if the warrant-holder has been prevented by Indian hostilities,

172

Commonwealth v. Coxe.

from making his settlement within two years, next after the date of his warrant, and until the 22d of December 1795 (the time of ratification of General Wayne's treaty), the condition of settlement and residence is extinct and gone.

(2.) That though such prevention did not wholly dispense with the condition, it hindered its running within that period; and that the grantee's persisting in his endeavors to make an actual settlement and residence, for five years, or within a reasonable time thereafter, shall be deemed a full compliance with the condition.

(3.) That in all events, except the death of the party, the settlement and residence shall precede the vesting of the complete and absolute estate.

Though such great disagreement has obtained, as to the true meaning of this 9th section, both sides agree in this, that it is worded very inaccurately, inartificially and obscurely. Thus, it will be found, towards the beginning of the clause, that the words "actual settlement," are used in an extensive sense, as inclusive of residence for five years: because its constituent parts are enumerated and described, to be by "clearing, fencing and cultivating at least two acres for every hundred acres, contained in one survey; erecting thereon a messuage for the habitation of man, and residing, or causing a family to reside thereon, *for the space of five years, next following his first settling the same, if he or she shall so long live." In the middle of the clause, the same words are used in a more limited sense, and are coupled with the expression "and residence," and in the close of the section, in the proviso, the same words, as I understand them, in a strict grammatical construction of the whole clause, must be taken in the same large and comprehensive sense, as they first conveyed; because, the terms "such actual settlement," used in the middle of the section, are repeated in the proviso, and refer to the settlement described in the foregoing part: and the words "actual settlement, as aforesaid," evidently relate to the enumeration of the qualities of such settlement. Again, the confining of the settlement to be within the space of two years next after the date of the warrant, seems a strange provision. A war with the Indian natives subsisted, when the law passed, and its continuance was uncertain. The state of the country might prevent the making of surveys for several years; and until the lands were appropriated by surveys, the precise places where they lay, could not be ascertained generally.

Still, I apprehend, that the intention of the legislature may be fairly collected from their own words. But I cannot accede to the first construction, said to have been made of the proviso in this 9th section; because it rejects as wholly superfluous, and assigns no operation whatever, to the subsequent expressions "if any grantee shall persist in his endeavors," &c., which is taking an unwarrantable liberty with the law. Nor can I subscribe to the second construction stated, because it appears to me to militate against the general spirit and words of the law, and distorts its great prominent features in the passages already cited, and for other reasons, which I shall subjoin. I adhere to the third construction, and will now again consider the 9th section. It enacts, in the first instance, that " no warrant or survey for lands, lying north and west of the rivers Ohio and Allegheny and Conewango creek, shall vest any title, unless the grantee has, prior to the date of such warrant, made or caused to be made, or shall,

[*202

Commonwealth v. Coxe.

within the space of two years next after the date of the same, make or cause to be made, an actual settlement thereon, by clearing, &c. Provided always, nevertheless, that if any such actual settler, or any grantee in any such original or succeeding warrant, shall by force of arms of the enemies of the United States, be prevented from making such actual settlement, or be driven therefrom, and shall persist in his endeavors to make such actual settlement as aforesaid ; then, in either case, he and his heirs, shall be entitled to have and to hold the said lands, in the same manner as if the actual settlement had been made and continued."

"Persist" is the correlative of attempt or endeavor, and signifies "hold on," "persevere," &c. The beginning words of the section, *restrict the settlement, "to be within two years next after the date of the warrant, by clearing, &c., and by residing for the space of five years, next following his first settling of the same, if he or she shall so long live ;" and in default thereof, annexes a penalty of forfeiture, in a mode prescribed But the proviso relieves against this penalty, if the grantee is prevented from making such settlement by force, &c., and shall persist in his endeavors to make such actual settlement as aforesaid. The relief, then, as I read the words, goes merely as to the times of two years next after the date of the warrant, and five years next following the party's first settling of the same ; and the proviso declares, that persisting, &c., shall be equivalent to a continuation of the settlement.

To be more intelligible, I paraphrase the 9th section thus :—Every warrant-holder shall cause a settlement to be made on his lands, within two years next after the date of his warrant, and a residence thereon for five years next following the first settlement, on pain of forfeiture, by a new warrant. Nevertheless, if he shall be interrupted or obstructed, by external force, from doing these acts, within the limited periods, and shall afterwards persevere in his efforts, in a reasonable time after the removal of such force, until those objects are accomplished, no advantage shall be taken of him, for the want of a successive continuation of his settlement.

The construction I have adopted, appears to me to restore perfect symmetry to the whole act, and to preserve its due proportions. It affords an easy answer to the ingenious question, proposed by the counsel of the Holland Company. If, say they, immediately after a warrant issues, a settler, without delay, goes on the ground, the 11th of April 1792, and stays there until the next day, when he is driven off by a savage enemy, after a gallant defence ; and then fixes his residence as near the spot as he can, consistently with his personal safety, does the warrantee lose all pretensions of equity ? Or, suppose, he has the good fortune to continue there, firmly adhering to the soil, for two or three years, during the Indian hostilities ; but is, at length, compelled to remove by a superior force, is all to go for nothing, and must he necessarily begin again ? I answer to both queries, in the negative—by no means. The proviso supplies the chasm of successive years of residence ; for every day and week he resides on the soil, he is entitled to credit in his account with the commonwealth : but upon a return of peace, when the state of the country will admit of it, after making all reasonable allowances, he must resume the occupation of the land, and complete his actual settlement. Although a charity cannot take place according to

the letter, yet it ought to be performed *cypres*, and the substance pursued. (2 Vern. 266 ; 2 Fonbl. 221.)

*It has been objected, that such a contract with the state, is [*204 unreasonable, and hard on those land-holders, and ought not to be insisted upon. It will be said, in reply, they knew the terms before they engaged in the bargain, and must abide by the consequences : the only question is, whether the interpretation given of it be correct or not.

7th. A due conformity to the provisions of the act, is equally exacted of those who found their preference to lands on their personal labor, as of those who ground it on the payment of money. I know of no other distinctions between these two sets of land-holders, as to actual settlement and residence, than that the claims of the former must be limited to a single plantation, and the labor be exerted by them, or under their direction ; while the latter may purchase as many warrants as they can, and make, or cause to be made, the settlements required by law. (Addison, 340, 341.)

It is admitted, on all sides, that the terms of actual settlement and residence, are, in the first place, precedent conditions to the vesting of absolute estates in these lands ; and I cannot bring myself to believe, that they are dispensed with, by unsuccessful efforts, either in the case of warrant-holders, or actual settlers. In the latter instance, our uniform decisions have been, that a firm adherence to the soil, unless controlled by imperious circumstances, was the great criterion which marked the preference in such cases ; and I have seen no reason to alter my opinion.[1]

8th. Lastly, it is obvious from the preamble, and § 2, that the settlement of the country, as well as the sale of the lands, was meditated by this law ; the latter, however, appears to be a secondary object with the legislature. The peopling of the country, by a hardy race of men, to the most extreme frontier, was certainly the most powerful barrier against a savage enemy.

Having been thus minute, and I fear tedious, in delivering my opinion, it remains for me to say a few words, respecting those persons who have taken possession of part of these lands, supposing the warrants to be dead, according to the cant word of the day, and who, though not parties to the suit, are asserted to be implicated in our decision. If the lands are forfeited in the eye of the law, though they have been fully paid for, the breach of the condition can only be taken advantage of by the commonwealth, in a method prescribed by law. Innumerable mischiefs and endless confusion would ensue, from individuals taking upon themselves to judge when warrants and surveys cease to have validity, and making entries on such lands at their will and pleasure. I will repeat what we told the jury in *Morris's Lessee* v. *Neighman and Shaiver* (2 Yeates 453), "If the expressions of the law were not as particular as we find them, we should have no difficulty in *pronouncing that no person should take advantage of their own [*205 wrong, and that it does not lie in the mouths of men, like those we are speaking of, to say the warrants are dead ; we will take and withhold the possession, and thereby entitle ourselves to reap benefits from an unlawful act." On the whole, I am of opinion, that the rule should be discharged.

SMITH, Justice.—I have had a full opportunity of considering the opinion

---

[1] Denied, by KENNEDY, J., in Campbell v. Galbreath, 1 Watts 81.

Commonwealth v. Coxe.

delivered by my brother Yeates; and as I perfectly concur in all its principles, I shall confine myself to a simple declaration of assent. I could not hope, indeed, to add to the argument; and I am certain, I could not equal the language which he has used on the occasion.

By the Court.—Let the rule be discharged. (*a*)

---

(*a*) Since this decision was pronounced, the subject has been revived and agitated in various interesting forms. In the winter of 1801–2, several petitions were presented by the intruders, to the legislature, requesting their interposition, but the committee of the senate, to whom these petitions were referred, reported against them, and admitted, that the controversy belonged exclusively to the courts of justice. But soon after this report was made, a bill was introduced, entitled "An act," &c. which recites the existing controversies, gives a legislative opinion against the claim of the warrantees, and institutes an extraordinary tribunal, to hear and decide between the parties. The appearance of this bill produced two remonstrances from the Holland Company, but without effect. As soon as it became a law, the attorney-general and the counsel for the company were invited to a conference with the judges, on the carrying of it into effect; but, upon mature consideration, the counsel for the company declined taking any part in the business, and assigned their reasons in a letter addressed to the judges, dated the 24th of June 1802. An issue was then formed, by the direction of the judges, which was tried at Sunbury, on the 25th of November following, before Yeates, Smith and Brackenridge, justices, and a report of the proceedings and decision on that occasion will be found in a subsequent part of the present volume.[2]

[1] Act 2d April 1802, P. L. 153.

[2] Attorney-General *v.* The Grantees, *post*, p. 237. The Holland Land Company thereupon instituted a number of ejectments in the circuit court of the United States, one of which was certified, on disagreement of opinion between the judges, to the supreme court, where the question was determined in favor of the title of the Holland Land Company, in opposition to the decision of the state court. Huidekoper *v.* Douglass, *post*, p. 392, more fully reported in 3 Cr. 1. And on a second trial, there was a verdict and judgment in favor of that title. 1 W. C. C. 258. But though this judgment settled the rights of the company, in the particular case, yet it is said by Judge Kennedy, in Campbell *v.* Galbreath, 1 Watts 101, that the supreme court of the state never changed its decision. And it is very questionable, whether Huidekoper *v.* Douglass was rightly decided, since the 34th section of the judiciary act declares that the laws of the several states shall be regarded as rules of decision, in trials at common law, in the court of the United States, in cases where they apply. And accordingly, it has frequently been determined, that the federal courts are bound by the decisions of the highest state courts, as to the local law of real property, whether grounded on the construction of a statute, or on the unwritten law of the state. St. John *v.* Chase, 12 Wheat. 153; Bell *v.* Morrison, 1 Pet. 352; Henderson *v.* Griffin, 5 Id. 151; Green *v.* Neal, 6 Id. 291; Brashear *v.* West, 7 Id. 609; Beauregard *v.* New Orleans, 18 How. 497; Suydam *v.* Williamson, 24 Id.; Chicago *v.* Robbins, 2 Black 419; Sumner *v.* Hicks, Id. 352; Williamson *v.* Suydam, 6 Wall. 723; Williams *v.* Kirtland, 13 Id. 306; Richmond *v.* Smith, 15 Id. 429.